John URANGA, III, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–07–00017–CR.

Court of Appeals of Texas, Texarkana.

Submitted Jan. 9, 2008.

Decided Feb. 21, 2008.

Erika Copeland, Law Office of Erika Copeland, Abilene, for appellant.

John Brasher, Asst. Dist. Atty., Barry L. Macha, Dist. Atty., Wichita Falls, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

After John Uranga, III, was convicted for possession of methamphetamine in an amount greater than one gram but less than four grams, his punishment trial on that charge was conducted, during which the jury was shown a videotape of an extraneous-offense car chase in which a patrol unit driven by Officer Ryan Piper of the Wichita Falls Police Department pursued a vehicle driven by Uranga.[1] One of the jurors watching the videotaped chase was surprised to see Uranga's fleeing vehi-

---

1. Late in the evening of September 20, 2006, as Officer Piper patrolled an area of Wichita Falls known for gang activity, Piper observed a vehicle failing to use a turn signal before making a right-hand turn. *See* TEX. TRANSP. CODE ANN. § 545.104 (Vernon 1999) (operator intending to turn vehicle right or left shall signal). Piper followed the car and subsequently witnessed several additional traffic violations. Eventually, Piper activated his patrol car's overhead lights and attempted to make a traffic stop. Rather than yield to the officer's display of authority, the car fled. During the ensuing chase, the suspect drove his vehicle into a residential neighborhood, "swung a turn wide, hit the curb, went up into someone's yard there on York Street, came out of the yard, back onto York, and then accelerated [away]." The driver later abandoned his vehicle in a private driveway and fled on foot. Other area police officers then joined the pursuit. The suspected driv-

cle careen through the juror's own front yard. The juror thus learned that Uranga had been the previously unknown person who had driven through the juror's yard on that occasion, making him a victim of Uranga's extraneous offense. The juror reported his surprising discovery to the trial court. After receiving repeated assurances from the juror that he would remain impartial notwithstanding his victim status, the trial court kept him on the jury and denied Uranga's motion for a mistrial.

On appeal, Uranga contends that we should presume harm from the victim-juror's participation in assessing punishment and, therefore, that we should find error from the rejection of the motion for a mistrial. Uranga urges that, because of such alleged error, he was denied his right to a fair and impartial jury under the Texas Constitution.[2] In a separate argument, Uranga also contends the evidence was legally and factually insufficient to prove he was guilty of the crime in question. We affirm the trial court's judgment.

*(1) The Trial Court Did Not Abuse Its Discretion in Denying Uranga's Mistrial Motion*

■ We review a denial of a mistrial motion under an abuse of discretion standard. *Webb v. State*, 232 S.W.3d 109, 111 (Tex.Crim.App.2007); *Kipp v. State*, 876 S.W.2d 330, 339 (Tex.Crim.App.1994); *Howard v. State*, 982 S.W.2d 536, 537 (Tex. App.-San Antonio 1998, pet. dism'd). The Texas Constitution guarantees an accused the right to trial by an impartial jury. TEX. CONST. art. I, § 10. This provision means that the jury must not be partial, must not favor one party more than another, must be unprejudiced and disinterested, and should be equitable and just, deferring judgment on the merits of a case until after the presentation of all the evidence. *Duncan v. State*, 79 Tex.Crim. 206, 184 S.W. 195, 196 (1916).

■ The constitutional standard of jury impartiality is a question of law, which we review under a de novo standard. *Ruckman v. State*, 109 S.W.3d 524, 527 (Tex.App.-Tyler 2000, pet. ref'd). "Whether a juror's impartiality may be presumed from the circumstances is a question of law." *Id.* at 528. In his brief, Uranga has not directed us to any authority mandating that we presume bias by the at-issue juror based on the facts of this case. Nor have we found authority adopting an "implied bias" doctrine under the Texas Constitution. Additionally, we note that the Texas

er, identified in court as Uranga, was eventually caught. A videotape of this car chase (which suggests Uranga committed the crimes of evading arrest, *see* TEX. PENAL CODE ANN. § 38.04(b)(1) (Vernon 2003), and criminal mischief), *see* TEX. PENAL CODE ANN. § 28.03 (Vernon Supp.2007), was admitted as evidence of an extraneous offense and shown to the jury during Uranga's punishment trial in this case.

2. In *Sneed v. State*, 209 S.W.3d 782, 787 (Tex. App.-Texarkana 2006, pet. ref'd), this Court recommended a statutory change to allow jurors to be replaced with alternates in more situations, and thereby avoid challenges of the type that has been raised in this case. In

response to our suggestion, effective September 1, 2007, Article 33.011(b) of the Texas Code of Criminal Procedure was amended to broaden the situations in which an alternate juror may be seated. *See* TEX.CODE CRIM. PROC. ANN. art. 33.011(b) (Vernon Supp.2007). No longer is it essential to find that the original juror has become unable to continue serving or is disqualified from continued service. In this case, an alternate juror might have been used if one had been available. Nothing in this record suggests, however, that any alternate juror was available to the trial court. Trial courts may find that having an alternate juror in many, or all, cases could prove procedurally and fiscally beneficial.

Court of Criminal Appeals has expressly held that our state constitution's guaranty of an impartial jury is *not* greater than that afforded under the Sixth Amendment to the United States Constitution. *Jones v. State*, 982 S.W.2d 386, 391 (Tex.Crim. App.1998); *see* U.S. CONST. amend. VI. This fact is critical in our analysis, because while there is little Texas caselaw on the issue of an implied bias doctrine, the issue has been addressed by the United States Supreme Court. Accordingly, we turn to federal authority for guidance.

In its brief, the State properly points out that the United States Supreme Court has neither adopted nor rejected the "implied bias" doctrine as it would apply under the federal Sixth Amendment's right to a fair and impartial jury. Only Justice O'Connor has opined that the implied bias doctrine should be applied in limited circumstances such as when the at-issue juror is revealed to be an employee of the prosecuting agency, a close relative of one of the participants in the trial or in the criminal transaction, or was a witness or somehow involved in the criminal transaction. *Smith v. Phillips*, 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring).

Several years after Justice O'Connor's concurrence in *Smith*, the United States Supreme Court had occasion to review by habeas corpus a case in which one of the applicant's jurors had not only been related to the State's key witness, but had also been previously represented in a divorce proceeding by the prosecutor. *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Justice Kennedy's unanimous opinion in *Williams* can be read to suggest that prejudice would not be presumed on account of the juror's service in that case; instead, the applicant had the burden of developing a record that showed harm as a result of a trial before a juror who was both related to a witness and who had been previously represented by one of the prosecutors. *Id.* at 441–44, 120 S.Ct. 1479.

■ Given that neither the Texas Court of Criminal Appeals nor the United States Supreme Court has adopted the implied bias doctrine when it is discovered in the middle of a punishment trial that a juror is a victim of the defendant's extraneous (misdemeanor-level) conduct, we shall not follow Uranga's suggestion that such a doctrine must be applied in this case. Instead, we shall examine the record for any evidence of *actual* bias on the part of the at-issue juror. For such evidence, we shall examine the trial court's questioning of the juror at the time the issue arose during trial, as well as any post-judgment evidence brought forth by the appellant in seeking a new trial.

In the record now before us, the at-issue juror had not himself witnessed Uranga drive through the juror's yard in the dead of night on September 20. Nor had that juror known, until watching the videotape of the incident at trial, who might have caused the damage. The juror told the trial court that he was not interested in pursuing criminal charges against Uranga on the basis of what all parties agreed was "minimal" damage; instead, the juror intended to repair the landscaping himself.[3]

---

**3.** At best, the record suggests Uranga's criminal mischief offense resulted in less than $500.00 of damage to the at-issue juror's property. Given such a modicum of damage, Uranga's offense was most likely either a class B misdemeanor (punishable by no more than a $2,000.00 fine, six months in jail, or both a fine and jail) or a class C misdemeanor (punishable by a fine not to exceed $500.00). *See* TEX. PENAL CODE ANN. § 28.03(b)(1), (2) (distinguishing level of misdemeanor crime based on pecuniary loss by victim), § 12.22 (class B misdemeanor punishment), § 12.23 (Vernon 2003) (class C misdemeanor punishment).

The juror also *repeatedly* promised the trial court that he would not use this incident against Uranga in deciding the sentence.[4] Though Uranga's pro se motions for new trial raised the issue of the trial court's failure to excuse the now at-issue juror during the punishment trial, the trial court did not conduct a hearing on Uranga's post-conviction motions. Accordingly, we have no evidence about this juror's service beyond the trial court's initial questioning amidst trial.

The trial court was in the best position to weigh the believability of the juror's repeated promises to both the court and the parties that, in deciding Uranga's punishment, he would not take into account his status as the victim of Uranga's extraneous criminal mischief. Therefore, to the extent that the record supports the trial court's conclusion that the juror would remain unbiased—and absent any evidence to the contrary—we cannot say our de novo review of the record affirmatively reveals a clear abuse of the trial court's discretion in ruling on Uranga's motion for a mistrial.[5] *Cf. Uttecht v. Brown,* —— U.S. ——, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) (to evaluate claim that criminal defendant's Sixth Amendment right to impartial jury has been abridged in capital cases, reviewing courts should show deference to trial court's judgment based in part on demeanor of juror in answering questions about ability to put aside alleged bias).

### (2) Legally and Factually Sufficient Evidence Supports Uranga's Conviction

The jury found Uranga guilty of two offenses: (1) possession of methamphetamine in an amount greater than one gram but less than four grams and (2) theft of property valued at less than $50.00. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102(6) (Vernon Supp.2007) (methamphetamine is penalty group 1 substance), § 481.115(c) (Vernon 2003) (prohibiting possession of penalty group 1 substance in amount greater than 1 gram, less than 4 grams); TEX. PENAL CODE ANN. § 31.03 (Vernon Supp.2007) (theft).[6] Uranga now contends the evidence is legally and factually insufficient to support his drug conviction. He asserts the State's evidence is insufficient to demonstrate both actual possession of the alleged contraband and possession of any unadulterated methamphetamine weighing more than one gram.

We will review Uranga's legal and factual sufficiency challenges under the applicable appellate standards. *See Muckleroy v. State,* 206 S.W.3d 746, 747 (Tex.App.-Texarkana 2006, pet. ref'd) (citing *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000); *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996)); *see also Sartain v. State,*

4. Moreover, the trial court expressly instructed the juror to "not let it [the extraneous offense] influence you [the juror] in any way" and to "not share that experience with any of the other jury members until after we get through." The juror promised he would abide by the trial court's instructions. Uranga objected to allowing the punishment trial to continue with the same jury as it was then constituted. But Uranga conceded the damage done to the juror's yard was "minimal."

5. Our holding is based on the limited facts and procedural posture of this case. We do not address whether a different conclusion would be warranted if the extraneous offense at issue were more serious than a marginal misdemeanor case. *See, e.g., Howard,* 982 S.W.2d at 538–39 (trial court abused discretion by denying mistrial motion when juror was stepmother of victim in extraneous child rape case).

6. Uranga had originally been indicted for robbery. *See* TEX. PENAL CODE ANN. § 29.02 (Vernon 2003). The jury found him guilty of the lesser-included offense of theft.

228 S.W.3d 416, 420–21 (Tex.App.-Fort Worth 2007, pet. ref'd). To support a conviction for possession of methamphetamine in this case, the evidence adduced at trial must demonstrate Uranga (a) intentionally or knowingly; (b) had "actual care, custody, control, or management"; (c) of methamphetamine; (d) in an amount greater than one gram but less than four grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.002(38) (Vernon Supp.2007) (defining "possession"), § 481.115(a), (c) (Vernon 2003).

The record reveals these facts: Kimberly Pinner was working for the Sears department store in Wichita Falls August 19, 2005, when she detained two men (one of whom was Uranga) for suspected shoplifting. When Pinner searched through Uranga's Dillard's shopping bag (in which Pinner found several items believed to have been stolen from Sears), she found a satchel. Pinner then unzipped this satchel and saw what appeared to be drugs inside. Pinner closed the satchel, put it down in a location away from Uranga's reach, and continued questioning the suspects regarding the thefts. Meanwhile, Uranga kept repeatedly reaching toward his ankle in an attempt to retrieve something hidden inside his sock. These furtive movements made Pinner suspicious, and she repeatedly asked Uranga to remain still until police arrived. But Uranga did not heed Pinner's request; instead, he eventually regained possession of the satchel, which he opened to retrieve the drugs, and attempted to swallow those drugs. Sears employees were ultimately able to pull the drugs out of Uranga's mouth and regain control of the situation until police arrived.

Officer Brandie Young of the Wichita Falls Police Department later arrested Uranga. Young identified a plastic bag found in Uranga's satchel as containing marihuana, which was marked and admitted into evidence as State's Exhibit 3. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121 (Vernon 2003) (criminalizing possession of marihuana). Young further testified, that, during a search of Uranga (made pursuant to the arrest), the officer found digital scales—ultimately introduced as State's Exhibit 4. A different bag, which was marked and admitted as State's Exhibit 2, contained contraband of a different type, which Young sent to a chemical laboratory for scientific testing.

Officer Kevin Folmar, a ten-year veteran of the Wichita Falls Police Department and an experienced narcotics officer, testified that drug dealers often have digital scales in their possession. The particular scale admitted in this case—which was found in Uranga's possession at the time of his arrest—seemed to be such a scale.

William L. Todsen, a forensic chemist for the Texas Department of Public Safety Crime Laboratory in Abilene, testified he analyzed the contents of State's Exhibit 2 and found it to contain 3.29 grams of methamphetamine.

 Eli Ramos, Jr., testified on Uranga's behalf. At the time of trial, Ramos was incarcerated at the Abilene County Jail. Ramos admitted being previously convicted of theft, credit card abuse, burglary, and drug charges.[7] Ramos told the jury that, on August 19, 2005, he had met Uranga at the Wichita Falls mall for the pur-

---

7. We specifically note that theft is a crime of moral turpitude. *Bryant v. State,* 997 S.W.2d 673, 677 (Tex.App.-Texarkana 1999, no pet.); *Ludwig v. State,* 969 S.W.2d 22, 28 (Tex.App.-Fort Worth 1998, pet. ref'd); *see also* TEX.R. EVID. 609(a) (impeachment by evidence of conviction of crime of moral turpitude). Juries often will discount the testimony of someone shown to have been convicted of a crime of moral turpitude. *See Cross v. State,* 586 S.W.2d 478, 481 (Tex.Crim.App.1979).

pose of buying clothes for Uranga. Ramos said he had earlier purchased several items at Dillard's using his credit card. When asked whether the marihuana and methamphetamine found inside the Dillard's bag—of which Uranga had possession at the time he was detained by Sears security personnel—actually belonged to Ramos, Ramos exercised his Fifth Amendment right to not incriminate himself. *See* U.S. CONST. amend. V. Ramos never subsequently claimed ownership of the drugs found in Uranga's possession, though Ramos was given more than one such opportunity.

We conclude the State's evidence was legally sufficient. The testimony showed Uranga, immediately before being detained by Sears employees, had exercised sole possession of the Dillard's shopping bag inside of which was found a smaller satchel containing the narcotics. Uranga later attempted to destroy that drug evidence by eating it—a fact that suggests Uranga not only possessed the drugs, but was aware of their illegality as well as the consequences of their being found in his possession. The chemist's analysis showed the narcotics were methamphetamine and weighed within the applicable statutory range for this prosecution.[8] And while Ramos' testimony might cast suspicions on whether the drugs at issue originally came from him, his testimony in no way can be said to provide enough evidence to cause us to doubt the legal or factual sufficiency

of the jury's verdict regarding whether Uranga's possession of the methamphetamine was "knowing" or "intentional." Uranga's evidentiary sufficiency issues are overruled.

Because (1) the record does not support a conclusion the trial court erred by denying Uranga's motion for a mistrial during the punishment phase of the proceedings and (2) legally and factually sufficient evidence supports the jury's verdict, we affirm the trial court's judgment.

8. Uranga has argued on appeal that the evidence is legally and factually insufficient because the State's indictment alleged he possessed more than one gram but less than four grams of narcotics, but the State did not attempt to prove at trial that the 3.29 grams of methamphetamine did not include any adulterants or dilutants. The Texas Legislature amended the Controlled Substances Act in 1997 to expand the statutory definition of "controlled substance" to include not only "pure" narcotics, but to allow prosecution using aggregated weights that include adulterants and dilutants. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.002(5) (Vernon Supp. 2007). As such, Uranga's claim that the State may not rely on testimony about an aggregated weight—a measure that includes amounts for both pure narcotics and any accompanying additives that otherwise "cuts" or dilutes the purity of the drug—has been rendered meritless by virtue of the decade-old change in the underlying statute.