Opinion issued
January 27, 2011


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In
The

Court of
Appeals

For
The

First District
of Texas

————————————

NO. 01-09-01136-CR

———————————

William HENRY Perry, Appellant

V.

The
State of Texas, Appellee



 



 

On Appeal from the 122nd Judicial
District Court

Galveston County, Texas



Trial Court Case No. 08CR1123

 



 

 

 MEMORANDUM OPINION

Appellant, William Perry, appeals the trial
court’s judgment convicting him for the murder of Gary Wayne Bell.  See
Tex. Penal Code Ann. § 19.02 (West 2003).  In three issues, appellant challenges the
legal sufficiency of the evidence to support his conviction and corroborate
accomplice testimony, the factual sufficiency of the evidence, and the trial
court’s dismissal of a juror who was replaced with an alternate after the jury
began deliberating.  We conclude that the
accomplice testimony was corroborated, that the evidence is sufficient to
support appellant’s conviction, and that the trial court properly substituted a
juror with an alternate juror.  We
affirm.

Background

Because of the number of people who testified concerning the
events, we detail the background by examining (A) the facts as told by Joshua
Coleman and April Mowers, (B) the physical evidence recovered by police, (C) the
facts as told by Mary Jowers, (D) the facts as told by Arnold Garza, and (E)
the procedural history of the trial.[1]

A.      The Facts as
Told by Joshua Coleman and April Mowers

On April 12, 2008, appellant, Coleman, April, Mary, and Brian
Richardson lived together at a Travelodge Hotel in La Marque, Texas.  Coleman and April were romantically involved.  All but April were habitual cocaine users.

Appellant, Coleman, and April planned to leave for San
Antonio that day, intending eventually to leave Texas.  In the morning, they drove a stolen Toyota
Camry to a Comfort Inn Suites in Texas City, Texas.  They approached the door to room 112, but
Richardson, who already was there, allowed only appellant to enter.  Coleman testified that Richardson said that
he “was trying to take care of some business.” 
Coleman and April returned to the Camry and waited.  A short time later, Garza left room 112 and
joined Coleman and April at the Camry.  Garza
informed Coleman and April about “a guy” in room 112.  Garza briefly went back inside the hotel and
returned three minutes later.

Approximately 20 minutes after entering room 112, appellant
left the hotel and approached the Camry.  Coleman testified that appellant said that
“business was taken care of, that [they] had a new PT Cruiser.”  April testified that appellant said that he
“took care of the guy and . . . ha[d] a free PT Cruiser.”  Although their testimonies different as to
the location, Coleman and April both noticed that appellant had on his shirt some
small blood spots, which they had not seen before appellant entered room 112.  Coleman told appellant about the blood, and
appellant entered the Camry and removed his shirt.  Coleman and April both testified that appellant
left the Camry, carrying the shirt in his arms.

Appellant and Garza left in the PT Cruiser with appellant
driving.  Coleman thought they were going
to buy crack cocaine for the group.  Appellant
and Garza returned approximately 15 to 20 minutes later.  April heard appellant instruct Garza to “go
in and help clean up the mess.”  Appellant
went back into the hotel for about five minutes, came back to the Camry, and
asked Coleman and April not to leave.  Coleman
and April saw appellant briefly meet with Richardson in the parking lot.  Coleman and April could not hear what
appellant and Richardson said.  Appellant
returned to the Camry and left with Coleman and April.  They drove to Gonzales, Texas, where they
rented a hotel room.  As they were
driving, April asked appellant whether he killed Bell.  Appellant became angry and said that he did
not want to talk about it.  Appellant,
Coleman, and April were arrested later that night while breaking into a self-service
laundry.

After she was arrested, April immediately told Gonzales
police that she knew about a murder at the Comfort Inn Suites.  She testified, “I wasn’t sure what happened.  . . . I wanted them to check into it and find
out.  . . . Because if they really killed
him, I was just worried about it.”  April
admitted that she initially gave a false name to Gonzales police because of a
warrant for her arrest in Missouri.

B.      The Physical
Evidence Recovered by Police

The next morning, Galveston police found Bell’s body floating
next to a concrete pier in Galveston Bay.  Bell’s body was naked except for his socks.  His wrists and ankles were bound with belts,
and there was a string around his neck.  Bell
had been beaten and hog-tied.  His death
was caused by a combination of blunt force trauma, asphyxiation, and drowning.  That night, police arrested Mary, Richardson,
and Garza at a hotel in Jersey Village, Texas.  They were found in possession of Bell’s PT
Cruiser.

Police collected various pieces of physical evidence from
room 112 of the Comfort Inn Suites as well as the two hotels where Mary,
Richardson, and Garza, and April, Coleman, and appellant, were staying when
they were taken into custody.  Neither
DNA nor fingerprint evidence connected appellant to Bell’s death.  DNA and fingerprint evidence linked Mary, Richardson,
and Garza to the crime.  For example,
Mary’s DNA was discovered under Bell’s fingernails, and Garza left a
fingerprint on a lamp in room 112.

Police prepared a timeline from the Comfort Inn Suites’s
camera recordings that provided a second-by-second breakdown of relevant
events.  The tapes showed the following
series of events:

Shortly after 3:00 a.m., Richardson, Garza, and two
unidentified individuals arrived at the Comfort Inn Suites.  Garza signed something at the front desk, and
all four went to room 112.  At 3:50 a.m.,
all four left the hotel.

Richardson and Garza returned more than two hours later.  At 6:45 a.m., Bell arrived with Mary in
Bell’s PT Cruiser.  Bell entered the
lobby, used the front-desk phone, and returned to the PT Cruiser.  Mary got out of the PT Cruiser and went into
the lobby, at which point Bell drove away. 
Seconds later, Richardson ran out of the lobby, got into an unidentified
vehicle, and drove away.

About a half-hour later, appellant arrived in a Toyota
Camry.  Appellant walked toward room 112
and a few minutes later, returned to the Toyota Camry and left the parking
lot.  The Camry’s driver was not visible.

Just before 7:40 a.m., the PT Cruiser and the unidentified
vehicle driven by Richardson returned. 
The two unidentified individuals took the unidentified vehicle and left,
while Richardson and Bell entered the hotel. 
Bell was carrying a guitar.  Bell
was never again seen alive on the security tapes.

Shortly before 8:30 a.m., the Camry returned, and appellant,
Coleman and April got out.  They went
into the hotel, but the camera does not show whether they went into room
112.  Coleman and April came back out a
minute later and returned to the Camry. 
Shortly thereafter, Garza also left the hotel and went to the Camry with
Coleman and April.

At 8:44 a.m., Garza briefly reentered the hotel and came back
out less than a minute later.  Seconds
after Garza exited the hotel, appellant followed.  Appellant briefly got into the Camry.  Garza and appellant then went to the PT
Cruiser and drove away.  Although the
driver’s side of the PT Cruiser could not be clearly seen, the timeline stated
Garza entered the passenger side, and the police assumed appellant drove.

A little more than 30 minutes later, appellant and Garza
returned and reentered the hotel.  A few
minutes after that, appellant left the hotel, followed by Richardson.  Richardson and appellant had a brief
interaction.  Appellant got into the rear
passenger side of the Camry, and the Camry drove away.  Appellant, Coleman, April, and the Camry do
not again appear on the security tapes.

Mary drove away in the PT Cruiser later that morning for 45
minutes, and Richardson took the PT Cruiser for a little over an hour early
that afternoon.  After 7:00 p.m., they
both drove away in the PT Cruiser and returned with Garza, who was not shown
leaving the hotel previously.  The three
reentered the hotel, left again at 8:45 p.m., and returned again about 15
minutes later.

At 9:47 p.m., Richardson and Mary exited the hotel with a
luggage dolly, which the police timeline identified as carrying Bell’s
body.  Richardson loaded Bell’s body into
the PT Cruiser, and Richardson and Mary drove away.  They returned an hour later.  When they exited the car, Richardson was
wearing only shorts, and Mary was wearing her underwear.  The two went back into the hotel.  Shortly before midnight, Richardson and Garza
drove away.  The timeline of events ends
at midnight of April 12.

C.      The Facts as
Told by Mary Jowers

Mary testified that in the early morning hours of April 12, she
met Bell at the Travelodge in La Marque. 
They agreed that Bell would pay her $250 for sex.  They left the Travelodge in Bell’s PT Cruiser
and went to his mother’s house to retrieve the money.  While there, Bell played his guitar for Mary,
and the two smoked crack cocaine.  They
then went to a different motel in La Marque to consummate the transaction.  Bell and Mary used crack cocaine, and Mary
blacked out.  When Mary regained
consciousness, she was naked in bed with a used condom beside her.  The money Bell had given her was missing from
her purse.  She felt that she had been
raped because Bell had engaged in anal sex with her without her permission.  She asked Bell for the money he owed her, and
he told her they would have to go get it. 

Bell and Mary drove to the Comfort Inn Suites in Texas City.  Telling Mary that he was getting change in
order to pay her, Bell went to the front desk area of the hotel.  He returned to the PT Cruiser and told her,
referring to Richardson, “that black guy in there wants to talk to you.”  Mary and Richardson had a romantic
relationship.  Richardson knew she was a
prostitute and had on a few occasions arranged for her to have sex with men for
money, but Mary said that she did not consider Richardson to be her pimp.  Mary went inside to meet Richardson, and Bell
drove away without paying her.  Mary told
Richardson that Bell “just took off with [her] money and raped [her].”  Garza was also present, but Mary did not
indicate whether he was involved in her conversation with Richardson.

Richardson left in pursuit of Bell.  Richardson convinced Bell to return.  Richardson, Bell, Garza, and Mary entered room
112 of the Comfort Inn Suites.  Richardson
confronted Bell about what happened at the motel, but there was no physical
altercation between the two.  A short
time later, appellant, Coleman, and April approached the door of room 112, but
Richardson allowed only appellant to enter. 
Richardson told appellant that Bell had drugged and raped Mary.  Richardson then shoved Bell toward appellant,
and appellant shoved Bell to the ground.  Appellant and Richardson struck Bell with
their fists and feet.  Garza left the
room just as appellant shoved Bell. 
During the beating, appellant took the keys to Bell’s PT Cruiser.  Appellant then took Bell to the bathroom with
Richardson following close behind.

After Bell was in the bathroom, Richardson returned to the
main room looking for something to use to tie up Bell.  He told Mary to stay out of the bathroom, and
he went back in with Bell and appellant. 
Mary heard water running in the bathroom and a sound “like somebody was
wrestling.”  At one point, Mary saw Bell
in the bathtub through the reflection in the bathroom mirror; he was not tied
up at that time.  After about 20 minutes,
appellant left the bathroom and room 112 with the keys to Bell’s PT
Cruiser.  Appellant returned to the room
approximately 30 minutes later.  He smoked
crack cocaine in the bathroom, gave the keys to the PT Cruiser to Richardson,
left, and never returned.  Mary admitted
that she also smoked crack cocaine throughout the night and morning but said
that she was “not so high.”  She admitted
that she was not certain about how long the above events lasted.

Approximately 15 minutes after appellant left for the second
time, Mary left room 112 to get milk. 
She encountered Garza, and the two returned to room 112.  While Mary was gone, Richardson was alone in
the hotel room with Bell.  When Mary and
Garza returned, Bell was no longer in the bathroom.

That afternoon, Mary left to meet two customers for acts of
prostitution.  When she returned, she saw
that the shower curtain was missing and went to get another so that she could
use the shower.  Garza left to purchase
more crack cocaine.  After Mary showered,
Richardson pulled Bell’s body out of the bedroom closet.  Mary and Richardson loaded Bell’s body onto a
luggage cart, and they took him to the PT Cruiser.  Richardson put the body in the PT
Cruiser.  Richardson and Mary drove to
Galveston Bay, where they placed Bell’s body into the water.  Mary did not see Bell move or hear him make
any noise.

Mary and Richardson returned to the Comfort Inn Suites.  The next morning, Mary, Richardson, and Garza
left the Comfort Inn Suites together.  When
they left, they had with them Bell’s guitar, which Mary later traded for $50
worth of crack cocaine.  They went to
visit Mary’s children because Mary believed she would be incarcerated in the
near future.  Mary, Richardson, and Garza
were arrested at a hotel in Jersey Village that evening. 

At trial, Mary admitted that she was “[r]eally high” having
“smoked a lot” while she and Richardson transported Bell’s body from room 112
to Galveston Bay.  She admitted that she
was not honest with police about Richardson’s involvement in the events at the
Comfort Inn Suites because she wanted to protect him.  She admitted that she also lied to police in
order to protect herself.  She admitted
that she had made a deal with the State:
in exchange for her truthful testimony, she would receive only a ten-year
sentence for tampering with physical evidence by moving Bell’s body.

D.      The Facts as
Told by Arnold Garza

Garza testified that he was a cocaine addict having used
crack cocaine off and on for ten years. 
He was regularly using cocaine at the time Bell was killed.

Early in the morning of April 12, Garza and Richardson were
at the front desk of the Comfort Inn Suites. 
They were renting a room with a stolen credit card issued to a person
with a Hispanic name, so Garza signed for the room.  Bell entered the front-desk area, used the
courtesy phone, and then walked out.  Shortly
after Bell left, Mary walked in.  Mary briefly
spoke to Richardson, who then left.

Garza and Mary went to room 112.  Richardson returned with Bell, and Garza left
to buy drugs.  Garza returned, and Mary
explained that Bell had not paid her for sex as Bell had promised to do.  Appellant, Coleman, and April came to the
room, but Richardson would not let them enter.  A few minutes later, appellant returned alone
and entered the room.  Appellant pulled a
knife,[2] and told Garza to leave and
buy crack cocaine.  Garza moved towards
the door but turned around when he heard a “ruckus.”  Garza saw Bell on the ground with appellant
holding him down.  Garza then left the
room.

Garza did not want to ride with Coleman and April to buy drugs
so he waited in the parking lot.  Garza
briefly went back into the hotel lobby but did not go back into room 112.  Appellant came to the parking lot, changed
his shirt, and said “Well, now we got a PT Cruiser.  Let’s go.” 
Appellant did not say how he acquired the keys to the PT Cruiser.  Appellant and Garza left the Comfort Inn
Suites in the PT Cruiser.  on the way to
buy drugs, appellant told Garza about Bell’s beating, admitting that he knocked
out Bell because Richardson could not. 
Appellant said that they had put Bell in the bathtub and that appellant
was going to get plastic and a chain saw “to clean up the mess.”  Appellant told Garza that he did not stab
Bell “because it would have been too messy.” 
The two purchased drugs but did not buy anything else before they
returned to the Comfort Inn Suites.  On
cross-examination, appellant’s trial counsel elicited testimony from Garza that
he had not told police about his conversations with appellant in the PT
Cruiser.  Garza stated that he was not
directly questioned about any conversation with appellant until he spoke with
the district attorney.  

Garza and appellant returned to the hotel room approximately 15
to 20 minutes after they left, rejoining Mary and Richardson.  Garza could hear Bell kicking in the bathtub.  Garza did not ask what was happening.  Appellant said he was going to buy plastic
and left.  Richardson asked Garza to come
into the bathroom.  The shower curtain
was closed, but Garza could hear Bell asking for help from the bathtub.  Richardson tried to open the shower curtain,
but Garza stopped him.  Garza left the
bathroom, took his bag, left the hotel room, and went to a crack house.  Richardson and Mary picked him up that
evening, and they returned to the Comfort Inn Suites to smoke more crack
cocaine.  Richardson and Mary left again
for 30 to 45 minutes, and they returned in their underwear, wet, with their
clothes in their arms.  They said they
had gone swimming but Garza did not believe them.

Garza, Richardson, and Mary stayed in the Comfort Inn Suites
for a few more hours and then left to break into vending machines.  Garza did not clearly remember what happened
next.  The following day, the three stole
the hotel’s television set and left in the PT Cruiser.  They later stole clothes and shoes in the
Tomball area, broke into more vending machines, and visited Mary’s children at
her father’s house.  Garza, Richardson,
and Mary were arrested in the PT Cruiser on April 14.

Garza was charged with state-jail-felony theft with two
enhancements for stealing Bell’s PT Cruiser. 
He stated that he had not made any deal with the State for his
testimony.

E.      Procedural
History

Appellant was indicted for murder.  At appellant’s trial, Mary, Garza, Coleman,
and April testified.  The jury charge
designated Mary as an accomplice as a matter of law and Garza as an accomplice
as a matter of fact.  The charge did not
designate Coleman and April as accomplices.

Accomplice Testimony

As part of his first issue, appellant contends that Mary’s accomplice
testimony is insufficiently corroborated by non-accomplice testimony.  He also asserts that the jury charge should
have included accomplice-in-fact instructions as to Coleman and April.  

A.      Standard of
Review

“A conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows
the commission of an offense.”  Tex. Code Crim. Proc. Ann. art 38.14 (West 2005).  A person is an accomplice if he participates
with the defendant before, during, or after the commission of a crime and acts
with the required culpable mental state. 
Druery v. State, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007).  A person is an accomplice if his
participation involves some affirmative act that promotes the commission of the
offense with which the defendant is charged. 
Id.  A witness who has
knowledge of an offense is not an accomplice merely because he did not disclose
it or even because he concealed it.  Id.  Additionally, mere presence at the scene of
the crime does not render a witness an accomplice.  Id.  Similarly, complicity with the accused in the
commission of another offense apart from the charged offense does not render a
witness an accomplice.  Id.

A witness may be an accomplice either as a matter of law or
as a matter of fact; the evidence in a case determines which jury instruction,
if any, needs to be given.  Cocke v. State, 201 S.W.3d 744, 747
(Tex. Crim. App. 2006).  A trial court is obligated to instruct the jury
that a witness is an accomplice as a matter of law only if there is no doubt
that the witness is an accomplice.  Druery,
225 S.W.3d at 498.  A matter-of-law accomplice
instruction is appropriate when the witness is charged with the same offense as
the defendant or with a lesser-included offense, or the evidence clearly shows
that the witness could have been so charged. 
Id.  If the evidence is
conflicting, the trial court should instruct the jury to decide whether the
witness is an accomplice as a matter of fact. 
Id. at 498–99.  A trial
court is only required to charge the jury to determine whether a witness is an
accomplice as a matter of fact when there is some evidence of an affirmative
act on the part of the witness to assist in the commission of the charged
offense.  Id. at 499.  The trial court is not required to
give the jury an accomplice-witness instruction when the evidence is clear that
the witness is an accomplice neither as a matter of law nor as a matter of
fact.  Cocke, 201 S.W.3d at 748.

When an appellant challenges the
sufficiency of the evidence to corroborate an accomplice witness’s testimony,
we eliminate the testimony of the accomplice witness and consider the remaining
evidence to determine whether a rational juror could determine that the
non-accomplice evidence tends to connect the accused in some way to the
commission of the offense.  Simmons v.
State, 282 S.W.3d 504, 508–09 (Tex. Crim. App. 2009).  We view the corroborating evidence in
the light most favorable to the finding of guilt.  Torres
v. State, 137 S.W.3d 191, 196 (Tex. App.—Houston [1st Dist.] 2004, no
pet.); Cantelon v. State, 85 S.W.3d
457, 461 (Tex. App.—Austin 2002, no pet.). 
The non-accomplice evidence by itself need not
establish the defendant’s guilt beyond a reasonable doubt or directly link the
defendant to the commission of the crime. 
Hernandez v. State, 939 S.W.2d 173, 177 (Tex. Crim. App.
1997).  The law requires only that some
evidence tend to connect the accused to the commission of the offense.  Id. 
An accused’s mere presence in the company of the accomplice or
the informant before, during, or after the commission of the offense is
insufficient to corroborate testimony.  See Dowthitt v. State, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996).

B.      Accomplice Status of Joshua Coleman and April Mowers

The jury cannot rely on the
testimony of one accomplice to corroborate another.  Badillo v. State, 963 S.W.2d 854, 857
(Tex. App.—San Antonio 1998, pet. ref’d) (citing Chapman v. State, 470
S.W.2d 656, 660 (Tex. Crim. App. 1971)). 
We, therefore, will first consider whether the jury should have been
given accomplice-in-fact instructions as to Coleman and April.  Appellant contends that he, Mary, Richardson,
Garza, Coleman, and April were part of a de facto gang involved in a continuing
series of criminal enterprises, and that Bell’s death “may well have been” a
consequence of their gang activity. 
Appellant also suggests that Coleman and April were acting as lookouts
or standing guard outside the Comfort Inn Suites, that they provided
appellant’s “getaway transportation,” and that such activity would render them
accomplices whose testimony could not corroborate Mary’s testimony.  Finally, appellant suggests that April’s
statements and behavior after Bell was killed indicate that she was part of a
common plan with appellant.

The evidence establishes that
Coleman and April drove appellant to the Comfort Inn Suites.  They tried to enter room 112 with appellant,
but Richardson denied them entry.  They
returned to their stolen Toyota Camry and waited in the parking lot.  While waiting in the parking lot, they had
occasional contact with Garza, Richardson, and appellant.  They spoke with appellant after he left room
112 and told him that he had blood on his shirt.  They continued to wait while appellant and
Garza left in the PT Cruiser.  Appellant
returned, went back into room 112 for a few minutes, and came back to the
Camry.  Coleman, April, and appellant
drove away.

Appellant has not alleged any
affirmative act on the part of Coleman or April to assist in Bell’s
killing.  See Druery, 225 S.W.3d
at 499.  Neither their presence in the
parking lot of the Comfort Inn Suites nor their participation with appellant in
other offenses render them accomplices.  See
id. at 498.

Citing an opinion from the Court
of Criminal Appeals, an opinion from this Court, and an unpublished opinion
from the Fort Worth Court of Appeals, appellant argues that in this case, “all
of the direct witnesses were members of a ‘gang’ in all but formal name,
clearly associated in a continuing series of criminal enterprises, e.g.,
thefts, forgery, drug dealing, prostitution, and pimping.”  He suggests that gang membership and presence
at the scene of the crime is sufficient to warrant an instruction that Coleman
and April were accomplices as a matter of fact. 
Appellant, however, has presented no evidence of his theory, making the
cases he cites distinguishable.

In Medina v. State, the
Court of Criminal Appeals held that Holmes, a gang member who testified about a
drive-by shooting, was an accomplice as a matter of fact based on “(1) Holmes’
presence in the car with appellant when the crime occurred, (2) evidence that
the crime was a gang-motivated crime, (3) Holmes’ membership in the same gang
as appellant, and (4) Holmes’ efforts to cover up the crime” by hiding the
murder weapon.  7 S.W.3d 633, 642 (Tex.
Crim. App. 1999).  Two other witnesses
were not accomplices in any degree because each lacked one of the above
factors; one did not cover up the crime, and the other was not present when the
shooting occurred.  Id.  Here, Coleman and April were not present with
appellant when Bell was beaten.  Rather, the
evidence establishes that they never went inside room 112 and remained outside
in the parking lot of the Comfort Inn Suites. 
Thus, the first factor in Medina is not present here.  Further, the second and third factors that
the Medina court noted both depended on the membership of the defendant
and accomplice in a formal gang, La Raza 13, and there was affirmative evidence
that the crime was gang-related.  Id.
at 636 n.1, 643.  Here, while there is
evidence that appellant, Mary, Richardson, Garza, Coleman, and April
participated in illegal activities together, there is no evidence of any formal
relationship like there was in Medina. 
Thus, the second and third Medina factors are lacking here.  Finally, in Medina, the purported
accomplice helped the defendant hide the murder weapon.  Id. at 641.  Here, there is no such affirmative act with any
requisite mental state.  See Druery,
225 S.W.3d at 498.  Appellant has
established none of the factors enumerated by the Court of Criminal Appeals in Medina.

In Roof v. State, a
memorandum opinion, the Fort Worth Court of Appeals found the evidence sufficient
to warrant an accomplice-in-fact instruction. 
No. 2-08-148-CR, 2009 WL 485673 (Tex. App.—Fort Worth Feb. 26 2009, pet.
ref’d).  Like in Medina, the Roof
defendant and the others who committed the offense were members of a formal
gang, the Aryan Circle, and the witness knew it.  Id. at *1.  Further, in advance of the murder, the group in
Roof “discussed killing a person, asking whether [the defendant] was up
to it and trying to pump him up.”  Id.
at *3.  Additionally, the crime took
place just outside the witness’s truck.  Id.  Here, there is no evidence of a formal gang
and no evidence that Coleman and April had advance knowledge that a killing was
planned.  Moreover, Bell’s death occurred
in a hotel room to which Coleman and April were denied entry.  

Appellant also relies on Roof
for his assertion that Coleman and April “were waiting in close attendance in
the parking lot of the Comfort Inn, ‘as a lookout would.’”  No evidence shows that Coleman and April were
acting as lookouts.  Coleman and April
were merely present in the parking lot of the hotel where the crime took
place.  Presence near the scene of the
crime is not enough to transform a witness into an accomplice.  Druery, 225 S.W.3d at 498.  

No evidence shows that Coleman and
April were acting as “getaway drivers.” 
The record shows that the day before the murder, Coleman and April had
planned to leave town with appellant.  Furthermore,
no evidence shows that Coleman and April were acting with any culpable mental
state by leaving with appellant.

Similarly to Roof, this
Court held in Tran v. State that an accomplice-in-fact instruction was
appropriate where at least three members of the defendant’s group had guns, the
witness understood that the defendant and others planned to shoot at least one
person, the witness did not disclose the defendant’s plans, the witness went
along to the scene of the crime, and the witness did not seek medical help
after the shooting occurred even though he was wounded.  870 S.W.2d 654, 657 (Tex. App.—Houston [1st
Dist.] 1994, pet. ref’d).  This Court
noted in Tran that the fact that the witness entered the sandwich shop
where the shooting took place “may be evidence of an affirmative act in
assisting the commission of a crime by preventing members of complainant’s
group from escaping.”  Id.  Here, there is no evidence that April and
Coleman knew who Bell was, much less what was happening to him while they
waited in the parking lot.  Furthermore,
there is no evidence of an affirmative act assisting the commission of the
offense.

Medina, Roof,
and Tran are distinguishable from the present case.  Here, no evidence supports a conclusion that
the criminals involved in Bell’s killing were members of a formal gang, that April
and Coleman knew that Bell would be killed, or that April and Coleman took any
affirmative act in furtherance of Bell’s murder.  We conclude that presence at the scene of the
crime and membership in a loosely-associated group of criminals is insufficient
to support an accomplice-in-fact instruction.

Appellant also suggests that by
asking him “whether he killed the guy” after they left the Comfort Inn Suites, April
indicated that she in fact knew what had happened to Bell and was “attempt[ing]
to gauge her own exposure . . . in what she perceived to be a common plan.”  Even if the question indicated that she knew that
something had happened to Bell in room 112 earlier that day, April would not be
rendered an accomplice to Bell’s murder merely by after-the-fact knowledge that
the crime took place.  See Druery,
225 S.W.3d at 498.  

Similarly, a witness’s
cooperation or deals with police or the district attorney concerning other
crimes has no bearing on a witness’s status as an accomplice.  See, e.g., id. at 497–98; Cocke,
201 S.W.3d at 747–48.  April is not an
accomplice merely by her offer to give information about Bell’s death after she
was arrested or her negotiation of a plea agreement with the district attorney
involving crimes unrelated to the murder of Bell.

We hold there is no evidence that
would support an accomplice-in-fact charge as to the testimony of either
Coleman or April.  See Cocke, 201
S.W.3d at 748.  We overrule the portion
of appellant’s first issue challenging the omission of such a charge.

 

C.      Corroboration of Mary Jowers’s Testimony

Appellant contends that even if
Coleman and April were not accomplices, their testimony failed to link
appellant with Bell’s death and, therefore, does not corroborate the testimony
of Mary and Garza.[3]  Specifically, he argues that April “collapsed
as a competent witness” when she explained that she gave her statements to
police because she “wasn’t for sure what happened.”[4]  Appellant also contends that his “business”
was merely drugs, not murder, and that Coleman’s belief that the trip to the
Comfort Inn Suites was about a crack cocaine purchase was true.  Appellant contends that his use of the PT
Cruiser was permissive and that he returned to the hotel in order to give the
car keys back to Bell or Mary.  He
finally suggests that Coleman’s testimony is not credible because of purported discrepancies
and omissions in his statements about past offenses.[5]

The standard of review for
corroboration of accomplice testimony does not require us to find that Coleman
or April established appellant’s guilt or directly linked him to the commission
of the crime.  See Hernandez,
939 S.W.2d at 177.  It is only necessary
that we find some evidence that tends to connect appellant to the offense.  Id.

Here, the video shows Bell entering room 112 of the Comfort
Inn Suites.  The video and the
non-accomplice testimony from Coleman and April establish that appellant also
went into room 112.  The non-accomplice
testimony indicates that when appellant exited the hotel 20 minutes later, he
had blood on his shirt.  The video shows
appellant driving away in Bell’s vehicle. 
Additionally, the non-accomplice testimony includes appellant’s statement
that he “took care of the guy,” and that by doing so he obtained a “free PT
Cruiser.”  Evidence that a defendant was
at or near the scene of the charged crime at or about the time of its
commission when coupled with other suspicious circumstances may connect the
accused to the crime so as to furnish sufficient corroboration of an accomplice
witness’s statement.  Malone v. State, 253 S.W.3d 253, 257
(Tex. Crim. App. 2008).  We conclude the
non-accomplice evidence that appellant was in room 112 at or about the time
that Bell was killed there, combined with the evidence that appellant had blood
on his shirt, that appellant used of Bell’s vehicle, and that appellant made incriminating
admissions after leaving room 112 is sufficient to corroborate Mary’s testimony.  See id.

Sufficiency of the Evidence

In his first and second issues, appellant contends that the
State’s evidence is legally and factually insufficient to support the jury’s
verdict.  

A.      Standard of
Review

This
Court reviews legal and factual sufficiency
challenges using the same standard of review. 
Ervin v. State, No.
01-10-00054-CR, 2010 WL 4619329, at *2–4 (Tex. App.—Houston [1st Dist.] Nov. 10, 2010, pet. filed) (construing
majority holding of Brooks v. State,
323 S.W.3d 893, 912, 926 (Tex. Crim. App. 2010)).  Under this standard, evidence is
insufficient to support a conviction if considering all the record evidence in
the light most favorable to the verdict, no rational factfinder could have
found that each essential element of the charged offense was proven beyond a
reasonable doubt.  See Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789
(1979); In re Winship, 397 U.S. 358,
361, 90 S. Ct. 1068, 1071 (1970); Laster v.
State, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); Williams
v. State, 235 S.W.3d 742, 750
(Tex. Crim. App. 2007).  Viewed in the light most favorable to the
verdict, the evidence is insufficient under this standard in two
circumstances:  (1) the record contains
no evidence, or merely a “modicum” of evidence, probative of an element of the
offense; or (2) the evidence conclusively establishes a reasonable doubt.  See
Jackson, 443 U.S. at 314, 318 n.11, 320, 99 S. Ct. at 2786, 2789 &
n.11; Laster, 275 S.W.3d at
518; Williams, 235 S.W.3d at
750.  Additionally, the evidence is
insufficient as a matter of law if the acts alleged do not constitute the
criminal offense charged.  Williams, 235 S.W.3d at 750.

If an
appellate court finds the evidence insufficient under this standard, it must
reverse the judgment and enter an order of acquittal.  See Tibbs
v. Florida, 457 U.S. 31, 41,
102 S. Ct. 2211, 2218 (1982).  An appellate court determines whether the necessary inferences are
reasonable based upon the combined and cumulative force of all the evidence
when viewed in the light most favorable to the verdict.  See Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing Hooper v. State, 214 S.W.3d 9, 13 (Tex.
Crim. App. 2007)).  In viewing the
record, direct and circumstantial evidence are treated equally.  Id.  Circumstantial evidence is as probative as
direct evidence in establishing the guilt of an actor, and circumstantial
evidence alone can be sufficient to establish guilt.  Id.  An appellate court presumes that the factfinder
resolved any conflicting inferences in favor of the verdict and defers to that
resolution.  See Jackson, 443 U.S. at 326, 99 S. Ct. at 2793;
Clayton, 235 S.W.3d at 778.  An
appellate court also defers to the factfinder’s evaluation of the credibility
and weight of the evidence.  See Williams,
235 S.W.3d at 750.

          2.       Sufficiency Analysis

In his challenges to the sufficiency of the evidence, appellant’s
primary argument is that the testimonies of Mary, Garza, Coleman, and April are
fatally unreliable.  He further contends
that this Court determine that a note from the jury indicates that the evidence
is insufficient.  He also asserts that the
State’s decision not to take a DNA sample from Garza undermines confidence in
the jury’s verdict.  

                   a.       Elements of Murder

Under Texas Penal Code section 19.02, a person commits murder
when she (1) intentionally or knowingly causes the death of an individual or
(2) intends to cause serious bodily injury and commits an act clearly dangerous
to human life that causes the death of an individual.  Tex.
Penal Code Ann. § 19.02.  A person
is criminally responsible for the conduct of another when acting with intent to
promote or assist the commission of the offense, he solicits, encourages,
directs, aids, or attempts to aid the other person to commit the offense.  Id. §
7.02(a)(2).    

When viewed in the light most favorable to the prosecution,
the evidence permits a finding that appellant was guilty of murder.  Mary testified that appellant, along with
Richardson, delivered a brutal beating to Bell, and the medical examiner stated
that the beating was the primary cause of Bell’s death.  The photographs of Bell’s body and Mary’s description
of events in room 112 support the occurrence of a severe beating.  We hold that the jury could have rationally determined
that appellant committed murder by intentionally or knowingly causing Bell’s
death, by intending to seriously injure Bell and thereby causing Bell’s death,
or by acting with intent to aid Richardson and aiding Richardson in the
commission of the murder of Bell.  See Ervin, 2010 WL 4619329, at *3.

                   b.      Reliability

In his sufficiency argument, appellant contends that Mary,
the only witness who testified that she saw appellant and Richardson deliver
the fatal beating to Bell, was so influenced by drug use and self-preservation
that the jury “could not accept [her] testimony without making unfounded
assumptions about her very competence as a witness to see, perceive, and recall
events with any accuracy.”  Further, he
asserts that Garza purposefully avoided any actual knowledge of the beating and
that like Mary, Garza was under the influence of drugs and therefore his memory
of the events was unreliable.  In an
additional sufficiency argument, he asserts that Mary, Garza, Coleman, and April
should not be credited because they all testified with either “an explicit deal
or . . . obvious incentives to shade or outright fabricate their
testimony.”  

We
are required to view the evidence in the light most favorable to the
prosecution and to defer to the jury’s determination of weight and credibility
of witness testimony.  See Williams, 235 S.W.3d at 750.  Appellant,
however, contends that the Fourteenth Court of Appeals’ opinion in Redwine v. State requires a higher
degree of scrutiny in these circumstances. 
305 S.W.3d 360 (Tex. App.—Houston [14th Dist.] 2010, pet. ref’d).  Redwine
is inapplicable to the present case.  In Redwine, the evidence was held to be deficient
because the State’s sole witness who testified as to a crucial fact expressly
equivocated on the stand regarding that fact, undermining an essential element
of the offense as a matter of law.  See id. at 366-67.  The witness in Redwine testified equivocally about a specific fact and upon
reflection, testified that his earlier equivocal statement was not
correct.  Id.  Here, none of the
witnesses reversed themselves on the stand regarding an essential piece of
evidence.  Furthermore, the videotapes
taken from the hotel corroborated the stories told by the witnesses.

  The fact
that a witness entered a plea bargain or is alleged to have played some role in
the underlying criminal scheme affects the weight of the witness’s
testimony.  Gonzalez v. State, 63
S.W.3d 865, 874 (Tex. App.—Houston [14th Dist.] 2001), aff’d, 117 S.W.3d
831 (Tex. Crim. App. 2003).  The fact
that a witness is high on drugs at the time of the events to which he testifies
or makes inconsistent statements to police are also matters of weight and
credibility.  Ward v. State, No.
05-05-00366-CR., 2006 WL 3028923, at *1–2 (Tex.
App.—Dallas Oct. 26, 2006, pet. ref’d) (mem. op., not designated for
publication).  Under the Jackson
standard of review, we do not evaluate weight and credibility of witnesses.  See Williams, 235 S.W.3d at 750.  

                   c.       Jury Communication

Appellant urges this Court to review a note from the jury to
the trial court as support for his contention that the evidence is insufficient
to support the verdict.  He cites no
authority, and we have found none, that holds that we may weigh the contents of
jury communications as part of our review of the sufficiency of the evidence.

The note reads:  “If we
are split in a decission [sic] of murder and assault then according to page 9
paragraph three do we have to choose aggravated assault as our ruling?”  Appellant contends that except for the use of
the term “we,” this statement would be a verdict of not guilty on the murder
charge and guilty of aggravated assault.  The jurors’ note is no evidence that the
evidence is insufficient because it concerns the actual internal jury deliberations
about the evidence rather than a proper sufficiency of the evidence review,
which focuses on any rational factfinder. 
Jackson, 443 U.S. at 319, 99
S. Ct. at 2789.  

                   d.      Lack of DNA Evidence

Appellant contends that the State’s decision not to test Garza’s DNA
for comparison to “unknowns” undermines the jury’s verdict.  He suggests that if Garza’s DNA had matched
the “unknown” sample on a “cut belt” found in room 112 of the Comfort Inn
Suites, then Garza would have been implicated in Bell’s death, and the State
could not have prosecuted appellant.  

          Even
if Garza’s DNA were found on the cut belt, that evidence would have been
cumulative.  The jury was aware that the
DNA and fingerprint evidence did not connect appellant to the crime scene.  The jury was also aware that Garza had been at
the crime scene and left a fingerprint there. 
Appellant has failed to explain how the absence of DNA testing of Garza
requires a conclusion that no rational factfinder could find any element of the
crime charged beyond a reasonable doubt. 
See Williams, 235
S.W.3d at 750.  Viewing the evidence in a
light most favorable to the verdict, we hold a rational fact finder could have
found each essential element of murder was proven beyond a reasonable
doubt.  See Ervin,
2010 WL 4619329 at *2–4.

We overrule appellant’s first and second
issues.

Juror Substitution

In his final issue, appellant contends that the trial court
erred by excusing a juror and replacing her with an alternate.  He asserts that the Legislature “carefully
crafted a higher burden” for replacing a juror after deliberations begin and
that the juror’s stated reason for being unable to perform her duties did not
meet that burden.

During voir dire, Juror No. 3 informed the trial court that
she had a cousin who was dying of AIDS and that he had been rushed to the
hospital that day.  She stated that she
was very close to her cousin and that his illness would be a distraction.  She also stated that if her cousin died and
she was unable to attend the funeral, her ability to concentrate on this case
would be affected.  She was not challenged
for cause, and neither side used a peremptory challenge to strike her.

The jury began formal deliberations on Monday, October 27,
2009.  Juror No. 3 informed the trial court
that she received a phone call that her cousin was near death and that there was
nothing more that the doctors could do. 
Juror No. 3’s mother, who lived in Louisiana, wanted to be with the
family, and Juror No. 3 was the only person who could give her mother a ride.  Juror No. 3 told the trial court that she
could not say that she would be able to put her personal emergency out of her
mind and concentrate on the case, but she said that she would do her best.

Appellant objected to Juror No. 3’s dismissal on the ground
that she was the only African-American on the jury, and the alternate juror who
would replace her was a white male.  Over
appellant’s objection, the trial court discharged Juror No. 3 and replaced her
with the alternate.  Appellant timely
filed a motion for new trial asserting that Juror No. 3 was not “unable” to
perform her duties, and thus she could not be properly replaced by an alternate
juror pursuant to article 33.011 of the Texas Code of Criminal Procedure.  See
Tex. Code Crim. Proc. Ann. art.
33.011 (West Supp. 2010).

In 2007, the Legislature amended article 33.011 to provide
that “[a]lternate jurors . . . shall replace jurors who, prior to the
time the jury renders a verdict on the guilt or innocence of the defendant and,
if applicable, the amount of punishment, become or are found to be unable or disqualified to perform their
duties[.]”  Tex. Code Crim. Proc. Ann. art. 33.011(b). 
The previous version of article 33.011(b) stated that “Alternate jurors . . .
shall replace jurors who, prior to the time the jury retires to consider its
verdict, become or are found to be unable or disqualified to perform their
duties.”  Act of May 30, 1983, 68th Leg.,
R.S., ch. 775, § 2, 1983 Tex. Gen. Laws 4594 (amended 2007).  Therefore, the only difference between the
prior and current versions is that the current statute permits alternates to
replace jurors after the time that the jury retires but before the jury renders
its verdict.[6]  Because the Legislature declined to change
the phrase “unable or disqualified” when it revised article 33.011, we will
apply authorities construing this phrase prior to the change in the statute.  See
Grunsfeld v. State, 843 S.W.521, 523 (Tex. Crim. App. 1992).  

We first must address appellant’s contention that the term
“unable” is intentionally distinct from the term “disabled” as used in article
36.29 of the Code of Criminal Procedure and that it is restricted to those
cases in which a juror is physically sick or objectively mentally ill.  See
Tex. Code Crim. Proc. Ann. art. 36.29(a) (West Supp.
2010).  However, in Sneed v. State, the Texarkana Court of Appeals
held that “unable” for the purposes of section 33.011 is indistinguishable from
the term “disabled” as used in article 36.29 of the Code of Criminal Procedure,
which permits a trial court to allow eleven jurors to try a case when a juror
“dies or . . . becomes disabled.” 
209 S.W.3d 782, 786
(Tex. App.—Texarkana 2006, pet. ref’d). 
In Sneed, the State argued
that the Legislature’s use of the term “unable” gave the trial court broader
discretion than the term “disabled.”  Id. at 786–87.  The Texarkana court disagreed, concluding
that “one must strain to recognize real differences in the meaning of the two
words in this context.”  Id. at 786.  Thus, the test for whether Juror No. 3 was
unable to perform her duties is the same as the test for whether she is
“disabled”—that is, whether she was under some physical, mental, or emotional condition
that hinders her ability to perform her duties properly.  Id.
at 785.

The
determination of whether a juror is disabled is within the discretion of the
trial court.  Brooks v. State, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999).  Juror No. 3 was under severe emotional strain
from the immediately impending death of her cousin, with whom she was very
close.  This strain was increased by the
fact that her mother was unable to be with the family at that difficult time.  She informed the trial court that she did not
know whether she could continue to keep her mind on the case but only that she
could do her best.  

Texas
courts have repeatedly held that deaths in the family are sufficient to permit
the discharge of a juror due to disability. 
See, e.g., Clark v. State, 500 S.W.2d 107, 108–09 (Tex. Crim. App. 1973)
(death of father-in-law); Ricketts v.
State, 89 S.W.3d 312, 318 (Tex. App.—Fort Worth 2002, pet. ref’d) (death of
father); Allen v. State, 867 S.W.2d
427, 429–30 (Tex. App.—Beaumont 1993, no pet.) (aunt and brother-in-law died
within 24-hour period); Mills v. State,
747 S.W.2d 818, 820 (Tex. App.—Dallas 1987, no pet.) (grandfather’s funeral
scheduled during trial); see also Carillo
v. State, 597 S.W.2d 769, 771 (Tex. Crim. App. 1980) (noting civil
precedent holding that illness in juror’s family was sufficient to support
discharge).  While no case presents
circumstances directly analogous to those here, we note that the trial court
had the benefit of examining Juror No. 3 to evaluate her demeanor when the
juror indicated she did not know if she could concentrate on the case.  See Ricketts,
89 S.W.3d at 318.  We hold that the trial
court did not abuse its discretion by concluding that Juror No. 3 was incapable
of performing her duties because of the impending death of her close relative.  We overrule appellant’s third issue.

Conclusion

We affirm the judgment of the trial court.

 

 

 

 

                                                                   Elsa
Alcala

                                                                   Justice


 

Panel consists of Justices Jennings, Alcala, and
Sharp.

Do not publish. 
Tex. R. App. P. 47.2(b).











[1]           Because
of the similarity between their last names, we will refer to April Mowers and
Mary Jowers by their first names.





[2]           On
cross-examination, appellant’s trial counsel elicited testimony from Garza that
he had not told police about appellant’s display of a knife.  Garza stated that he mentioned the knife for
the first time when questioned by the district attorney prior to trial.

 





[3]           Without
elaboration, appellant suggests that Garza “was mistakenly charged as an
accomplice in fact.”  Appellant does not
brief any argument that the jury should have been instructed that Garza was an
accomplice as a matter of law.  We note,
however, that because we hold that the testimony of Coleman and April is
sufficient to tend to connect appellant with the charged offense, it serves to
corroborate Garza just as it serves to corroborate Mary.  See
Druery v. State, 225 S.W.3d 491, 498–99 (Tex. Crim. App. 2007).

 





[4]           April’s statement that she
“wasn’t for sure what happened” is consistent with her testimony that she never
went inside room 112 and that when she asked appellant whether he had killed
Bell, appellant did not answer.  She
explained that she told police about the incident at the Comfort Inn Suites
because she did not know what happened there and she was worried that Bell had
really been killed.

 





[5]           During
cross-examination, appellant’s attorney elicited testimony from Coleman that he
had misstated the color of the shirt that appellant removed after he left room
112 for the first time.  Counsel asked
Coleman if the prosecutor asked about the inconsistencies in Coleman’s
statements, and the State objected on work product grounds.

 

            Appellant contends
that the trial court “should have, at a minimum, conducted an in camera
review.”  Appellant did not request an in
camera review at trial.  That complaint,
therefore, is waived.  See Tex.
R. App. P. 33.1(a)(1); see also
Jabari v. State, 273 S.W.3d 745, 755 (Tex. App.—Houston [1st Dist.] 2008,
no pet.).  Furthermore, appellant
effectively cross-examined Coleman by pointing out the inconsistency in his
testimony, and any further discussion of that inconsistency would have been
cumulative.  See Menke v. State, 740 S.W.2d 861, 867 (Tex. App.—Houston [14th
Dist.] 1987, pet. ref’d).

 





[6]           The Legislature’s
revision of article 33.011 followed the Texarkana Court of Appeals’ 2006
opinion in Sneed v. State, in which
the court wrote, “We recommend the Legislature consider amending the statute
concerning the substitution of duly qualified alternate jurors for jurors on
the panel who may have developed legitimate reasons to be excused after the
jury has been empaneled.”  209 S.W.3d
782, 787 (Tex. App.—Texarkana 2006, pet. ref’d); see also Uranga v. State, 247 S.W.3d 375, 377 n.2 (Tex.
App.—Texarkana 2008), aff’d, 2010 WL
4628550 (Tex. Crim. App. Nov. 17, 2010) (noting revision of article 33.011 in
response to Sneed).